Max N. Tobias, Jr., Judge
hRenata Loya, the plaintiff/appellant, has filed the instant appeal seeking the reversal of the trial court’s grant of summary judgment in favor of Alied Cash Advance Louisiana, LLC (“Alied”). Because we find genuine issues of material fact exist as to whether Alied is vicariously liable for the alleged intentional tort of the defendant, Jasmine Lucas, we reverse that portion of the judgment and remand it to the trial court for further proceedings. However, we affirm the summary judgment insofar as it dismissed Ms. Loya’s claim of retaliatory discharge.
Consolidated with this appeal is the writ application of Lighthouse Property Insurance. Corporation (“Lighthouse”), Ms. Lucas’ homeowner’s insurer. Lighthouse intervened in the ongoing litigation and is providing a defense to Ms. Lucas under a reservation of rights. Lighthouse filed a motion for summary judgment seeking a determination that the incident is not covered by the homeowner’s policy. The trial court denied the motion for summary judgment; no reasons were given. Without reaching the merits of the writ application, we find that pursuant to La.. C.C.P. art 1094, Lighthouse, as intervenor, could not file aj ⅞ motion for summary judgment raising a new issue not raised by the original parties. Accordingly, we deny the writ application.

Facts and Procedural History

This case concerns a physical altercation between Ms. Loya and Ms. Lucas that occurred while they both were working for Alied at the Alied store during business hours. The issue of which woman was the aggressor is in dispute. However, the record reflects that the initial argument began over an email sent by Alied management regarding customer telephone calls and Ms. Loya’s and Ms.' Lucas’ respective duties and responsibilities as Alied employees.
On 10 September 2013, Ms. Lucas, store manager, and Ms. Loya, a sales associate, were working at Alied.[1] Their duties included marketing, inputting customer information into the computer, and making *931 reminder/collection calls to customers about their accounts. Ms. Loya also- made deposits.
On the date in question, Ms. Lucas received an email from her new supervisor, Jonathon Scott, asking why calls were not made for the collection accounts on a particular date. Ms. Lucas spoke to Ms. Loya about the email. In her deposition, Ms. Loya stated:
Well, Jonathon sent Jasmine an e-mail in reference to phone calls that wasn’t [sic] made in reference to the collections accounts. And so when she brought it to my attention, I said, what phone calls is he referring to, because I made some phone calls. I wasn’t able to make all the phone calls because I was in the store by myself, so I couldn’t do the calls and handle the customers coming into the store. And so she turned and looked at me and said, well, I don’t know—it’s showing there that |3you didn’t—I’m looking at it. You didn’t make calls. Are you stupid?
And so I looked at her and I got up. I say [sic], you’re not going to call me—I say this is your second time calling me stupid. And before I knew it, she hit me in my eye. She punched me.
Ms. Loya went on to explain that she later learned that Ms. Lucas was frustrated with her because they had two prior incidents.[2] Then she stated:
That’s why I got up. I’m like, “Why are you calling me stupid? This is your second time. You’re my manager. That’s not how you [sic] supposed to talk to me.” So that’s when she hit me.
Ms. Loya thought Ms. Lucas ]iad a personal problem with her and was having personal problems in her own family. Ms. Loya thought Ms. Lucas wap already “stressed out” and on edge by a non-work matter. . ..
Ms. Lucas was also deposed. She confirmed the receipt of the email from Mr. Scott regarding the phone calls. She claims, however, that Ms. Loya started the fight:
Q. And she hit you at your desk?
A. Yes, I was at my desk.
Q. And she had come over 'to your desk.
A. Yes.
Q. From her desk?
A. Yes.
LQ. And you said—and I was just trying to get it all together, so if I say anything wrong, just stop me. You said there was some verbal discussion before she came over.
A. Yes,
Q. And somewhere along the line you used the word stupid?
A. Yes.
Q. Did you direct that comment to her?
A. I just said that I was going to stop the bickering because I kind of saw where it was going, and I just hate when a person is being stupid. .
■ Ms. Lucas stated that Ms. Loya hit her own desk and said “You’re not going to call *932 me stupid.” Ms. Loya then stood up, came to Ms. Lucas’ desk, and hit her, making Ms. Loya the aggressor. She believed that Ms. Loya had a personal problem with her as well. !.
Both Ms. Loya and Ms. Lucas acknowledged that they had read and electronically signed the Field Associate Handbook provided by Allied upon their hiring. The handbook contained a section titled “Workplace Violence,” which states:
To= insure a safe workplace, the Company will not tolerate any type of workplace violence committed by or against other Associates, customers or visitors to the Company’s facilities. Associates are prohibited from making threats or engaging in violent activities, Violence is defined as including but limited to the following acts:
• Causing physical injury to another person.
• Making threatening remarks.
• Aggressive or hostile behavior that creates a reasonable fear on injury to another person, or subjects another person to emotional distress.
* * ⅜
|ffAny associate determined to have committed such acts will be subject to disciplinary action, up to and including termination.
Any associate who witnesses or is the victim of any violence or threats of violence should report such actions immediately to a supervisor, Human Resources Department or other management personnel. Any associate who makes such a report, in good faith, will not be retaliated against in any way. [Emphasis supplied.]
After the incident; Ms. Lucas left the Allied store and Ms. Loya called her supervisor to report the alleged attack. In that conversation; she told the supervisor that the matter was personal and not store/work related. However, in their depositions, both women stated that the only subject discussed before the physical altercation was the email from Mr. Scott and who was responsible for making collection phone calls.
The women also testified that after the second incident, supervisor Tory Bennett was supposed to call Ms. Loya and Ms. Lucas in for a meeting to discuss the issues between them. Ms. Lucas stated:
Q. And so what I think it sounds like you’re saying is that Ms. Loya didn’t take your criticism or direction as her manager very well, and she took it personally and she made it personal as to her. Is that what you’re saying?
A. Correct.
Q. Okay. And you addressed these concerns with Mr. Bennett, but he never got around to correcting the problem?
A. Correct.
Q. Okay. And all this culminated with this event that took place where you got into the physical altercation with Ms. Loya at the office?
A. Correct.
|fiBoth women were terminated by Allied soon after the incident.
Ms. Loya filed suit against Ms. Lucas, Allied, and Allied’s unknown insurer. Lighthouse intervened in the lawsuit as Ms. Lucas’ homeowner’s insurer. Thereafter, both Allied and Lighthouse filed motions for summary judgment. The motion filed by Lighthouse was denied and it filed a'writ application with this court while Allied’s motion was granted. Ms. Lucas filed this timely appeal.
Ms. Loya has asserted two errors for our review. First, she argues that issues of material fact exist regarding the Allied’s vicarious liability for Ms. Lucas’ conduct. *933 Second, -she contends that the trial- court erred in concluding that Ms. Loya’s termination was not a retaliatory response to her disclosure of the workplace attack to her supervisor.

Discussion

Summary judgments are reviewed on a de novo standard. Federal Work Ready, Inc. v. Wright, 15-1301, p. 3 (La.App. 4 Cir. 5/18/16), 193 So.3d 1217, 1220.

Retaliatory Discharge

We first discuss the issue of retaliatory discharge. Ms. Loya "claims that she was terminated because she reported the altercation to her supervisor on the day it occurred. Termination for such is prohibited by Allied’s Field Associates Handbook.
Ms. Loya admitted that she was an at-will employee. A person employed for an indefinite period is an “employee at will.” Bell v. Touro Infirmary, Inc., 00-0824, p. 4 (La.App. 4 Cir. 3/21/01), 785 So.2d 926, 928. As such, an at-will employee may be terminated “without assigning any reason for so doing.” La. C.C. art. 2747. “Beyond that, the reasons for termination need not be accurate, fair |7or reasonable. In fact, there need be no reason at all for termination.” Bell, 00-0824, p. 4, 785 So.2d at 928 [citation omitted].
A claim for retaliatory discharge provides two exceptions to La. C.C. art. 2747. The first is pursuant to La. R.S. 23:1361 B, which provides that an employer may not terminate an employee who has asserted a claim for workers’ compensation benefits. Ms. Loya did not file a claim for workers’ compensation so this exception does not apply.
The second exception is found in La. R.S. 23:967 A(l)-(3), commonly referred to as the “Whistleblower Statute.” On its face, the Whistleblower Statute supports actions by plaintiffs who .are aware of a workplace practice or act in which a violation of law actually occurred. Hale v. Touro Infirmary, 04-0003, p. 6 (La.App. 4 Cir. 11/3/04), 886 So.2d 1210, 1214, writ denied, 05-0103 (La. 3/24/05), 896 So.2d 1036. The Whistleblower Statute only offers protection to a specific class of employees: those employees who face “reprisals” from their employers based solely upon an employee’s knowledge of an illegal workplace practice and his refusal to participate in the practice or intention to report it. Id., 04-0003, p. 8, 886 So.2d at 1215. No illegal workplace practice is alleged by Ms. Loya.
Allied was free to terminate Ms. Loya and Ms. Lucas for no reason at all. Therefore, we find that the trial court correctly granted summary judgment in favor of Allied on this issue.

Vicarious Liability

The next issue is whether Allied is vicariously liable for Ms. Lucas’ alleged intentional act.
| «The law in this area- is clear that an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment. Orgeron v. McDonald, 93-1353 (La. 7/5/94), 639 So.2d 224, 226. The course of employment test refers to time and place. Benoit v. Capitol Manufacturing Co., 617 So.2d 477, 479 (La.1993). The scope of employment test examines the employment-related risk of injury. Id.
Baumeister v. Plunkett, 95-2270 (La. 5/21/96), 673 So.2d 994, 996. The Court continued:
According to Louisiana Civil Code article 2320, “[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.” In fact, this Court has held that in order for an employer to be *934 vicariously liable for the tortious acts- of its employee the “tortious conduct of the [employee must be] so closely connected in time, place, and causation to his - employment duties as to be regarded as a risk of harm fairly attributable to the employer’s business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer’s interest.” Barto v. Franchise Enterprises, Inc., 588 So.2d 1353, 1356 (La.App. 2d Cir.1991), writ denied, 591 So.2d 708 (1992) (quoting LeBrane v. Lewis, 292 So.2d 216, 217, 218 (La.1974)).
“An employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours.” Scott v. Commercial Union Ins. Co., 415 So.2d 327, 329 (La.App. 2d Cir.1982) (citing Bradley v. Humble Oil & Refining Co., 163 So.2d 180 (La.App. 4th Cir.1964)). “Vicarious liability will attach in such a case only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer’s objective.” Id.
Baumeister, 95-2270, pp. 3-4, 673 So.2d at 996-97.
One cannot say that the jurisprudence on this issue is overall consistent. However, we need not examine prior case law to set aside that portion of the motion for summary judgment. A genuine issue of material fact is presented by | ¡Allied's alleged knowledge of the tensions between Ms. Loya and Ms. Lucas. A meeting was supposed to be held with an Allied supervisor before the physical altercation occurred, a meeting that did not take place. In other words, the fight between the women during working hours may have been foreseeable, but we have nothing in the record to reach that conclusion,
A dispute also exists with regard to the actual aggressor in the altercation. Ms. Loya claims that Ms. Lucas struck her first during an argument about the email. Thus, this matter may be employment rooted invoking Allied-’s vicarious liability. Conversely, Ms. Lucas claims that Ms; Loya was the aggressor and came to Ms. Lucas’ desk after the argument. This could support Allied’s position that the . matter was purely personal. One cannot resolve these issues of fact on the record before us.
We reverse that portion of the summary judgment that dismissed Ms. Loya’s claim against Allied for vicarious liability arising out of the intentional tort allegedly committed by Ms. Lucas.

Writ Application

We finally address the supervisory writ application filed by Lighthouse. Lighthouse is Ms. Lucas’homeowner’s insurer. Lighthouse contends that since Ms. Loya’s alleged, injuries arose out of or in connection with- business engaged in by its insured, the policy issued to Ms. Lucas excludes coverage.[3]
Lighthouse intervened in the' lawsuit brought by Ms. Loya against Allied and Ms. Lucas, seeking a determination from the trial court that the policy did not | ^provide coverage for Ms. Loya’s injuries. Allied opposed Lighthouse’s writ application on the basis of improper procedure. It argued that as this issue was not raised by the parties in the lawsuit, Lighthouse is procedurally barred from raising the issue. We agree.
*935 La. C.C.P. art. 1091 governs how third persons may intervene into an action:
A third person having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties thereto by:
(1) Joining with plaintiff in demanding the same or similar relief against the defendant;
(2) Uniting with defendant in resisting the plaintiffs demand; or
(3) Opposing both plaintiff and defendant.
However, La. C.C.P. art. 1094 states: “[a]n intervener cannot object to the form of the action, to the venue, or to any defects and informalities personal to the original parties.” Louisiana courts have interpreted the article to mean that “[a]n intervenor, accordingly, takes the proceedings as he finds them; he cannot change the issue between the parties, and can raise no new ones.” Willis v. City of New Orleans, 14-0098, p. 4 (La.App. 4 Cir. 6/18/14), 143 So.3d 1232, 1234 (quoting Lions Gate Films, Inc. v. Jonesfilm, 12-1452, p. 6 (La.App. 4 Cir. 3/27/13), 113 So.3d 366, 370). See also IberiaBank v. Live Oak Circle Development, L.L.C., 12-1636, p. 7 (La.App. 1 Cir. 5/13/13), 118 So.3d 27, 32 (“He must take the suit as he finds it without raising issues between the defendant and the plaintiff that they have not themselves raised.”). “The reason why an intervenor’s rights are so limited is because he always has his own remedy by a separate action to inject] n new issues.” Id. (citing Marcello v. Louisiana Gaming Control Board, 04-0488, p. 5 (La. App. 1 Cir. 5/6/05), 903 So.2d 545, 548) [emphasis added].
Ms. Loya did not sue Lighthouse; she sued Ms. Lucas, Allied, and .AUied’s unknown. insurei.; The applicability of the Lighthouse policy is not at issue in the lawsuit. We find, therefore, that the summary judgment filed by Lighthouse was procedurally improper. We, thus, deny the writ filed by Lighthouse under our docket number 2016-C-0220.

Conclusion

Based on the foregoing, we affirm that part of the summary judgment granted by the trial court on the issue of retaliatory discharge, but reverse on the issue of. an employer’s vicarious liability for an employee’s intentional tort. Further, we deny the writ application filed by Lighthouse. We remand this matter to the trial court for further proceedings consistent with this opinion,
AFFIRMED IN PART; REVERSED IN PART; WRIT DENIED; REMANDED.

. The women were previously acquainted; Ms. Lucas recommended Ms. Loya for the job.

. The first incident occurred when Ms. Loya was involved in a motor vehicle accident and had to take the following day off work. Ms. Lucas became angry because she was to cover a different Allied store; no one would be available in the store at which they normally worked. Ms. Lucas complained that Ms, Loya did not contact her early enough for Ms. Lucas to work out the coverage issues. This exchange took place over the telephone,
The second took place after Ms.' Lucas called a customer at the customer’s job, when her account stated “Do not call my job.” the customer called Allied and Ms. Loya answered the phone; the customer was furious and Ms. Loya had to listen to it. When Ms. Loya spoke to Ms. Lucas about the call, ¡yte. Lucas replied, "You act like you [sic] stupid or something.” This was the first time Ms. Lucas called Ms. Loya stupid. _•

. Lighthouse also argues that once the trial court found that Ms. Lucas had committed an intentional tort for which Allied was not responsible, the policy excludes coverage for this set of facts as well. However, as we are reversing that portion of the summary judgment, this argument is mooted. '