HIGGINBOTHAM, J.
Plaintiff challenges the trial court's grant of defendant's motion for involuntary dismissal after plaintiff's presentation of evidence in a bench trial wherein the trial court determined that plaintiff failed to meet his burden of proof under La. R.S. 23:967, the Louisiana Whistleblower Statute ("LWS").
FACTS AND PROCEDURAL HISTORY
Plaintiff, Mr. Gerald Melancon, was hired by the Amite City Police Department (the Department) on March 24, 2008. On August 4, 2009, the Louisiana State Police sent a letter to Jerry Trabona, the Chief of Police for the Department, stating that an audit of the Department uncovered violations of the National Crime Information Center (NCIC) criminal database system. The audit revealed uses of the NCIC by Mr. Melancon for unauthorized purposes. After receiving the letter, the Department investigated further and found that Mr. Melancon's passwords for the *9 NCIC and Thinkstream[1] systems were used to run the names of thirteen individuals, including two Amite City council members, three officers with the Tangipahoa Parish Sheriff's Office, seven employees of the Department, and his wife, Gerilyn Melancon. During interviews with Mr. Melancon conducted as part of the Department's investigation, Mr. Melancon denied running the names on several occasions.
On September 1, 2009, at a meeting of the City Council of the Town of Amite City, Chief Trabona recommended that Mr. Melancon be dismissed from the Department for not following rules and regulations of the department by "running criminal history checks on thirteen people ... in violation of [ La. R.S. 15:596 ]." The city council unanimously accepted Chief Trabona's recommendation to terminate the employment of Mr. Melancon.
After Mr. Melancon was terminated, he filed a "Petition to Void Action of the Town of Amite City," arguing that the Town of Amite City (Town) did not comply with the notice provisions in La. R.S. 42:6.1[2] , and the action terminating Mr. Melancon should be declared null and void. Subsequently, Mr. Melancon filed a "Petition for Damages" against the Town seeking damages under La. R.S. 23:967, the Louisiana Whistleblower Act. Specifically, in his petition, Mr. Melancon contended that he expressed concerns with his supervisors, including Chief Trabona, about violations of state law he saw occurring within the Department, and that his disclosure of the violations was a motivating factor in the Town's decision to terminate him. Additionally, Mr. Melancon contended that he was instructed by his captain to perform the criminal background checks as part of his investigation into the persons he thought were responsible for violations of the law.
Mr. Melancon's petitions were consolidated for trial held on August 9 and 10, 2017. At the close of Mr. Melancon's case, the Town moved for a judgment of involuntary dismissal. After taking the matter under advisement, the trial court found that Mr. Melancon failed to carry his burden of proof and signed a judgment on October 27, 2017, granting the Town's motion for involuntary dismissal. It is from this judgment that Mr. Melancon appeals, assigning error to the trial court's conclusion that Mr. Melancon did not prove by a preponderance of the evidence that he was fired for acts protected under La. R.S. 23:967.
LAW AND ANALYSIS
Louisiana Code of Civil Procedure article 1672(B) provides the basis for an involuntary dismissal at the close of a plaintiff's case in a bench trial, when a plaintiff has shown no right to relief based on the facts and law. In determining whether involuntary dismissal should be granted, the appropriate standard is whether the plaintiff has presented sufficient evidence in his case-in-chief to establish a claim by a preponderance of the evidence, which means taking the evidence as a whole, the fact or cause sought to be proved is more probable than not. Jackson v. Capitol City Family Health Center, 2004-2671 (La. App. 1st Cir. 12/22/05), 928 So.2d 129, 131. When considering a motion for involuntary dismissal, a plaintiff is entitled to no special inferences in his favor.
*10 However, absent circumstances in the record casting suspicion on the reliability of the testimony and sound reasons for its rejection, uncontroverted evidence should be taken as true to establish a fact for which it is offered. Id.
The trial court's grant of an involuntary dismissal is subject to the manifest error standard of review. Broussard v. Voorhies, 2006-2306 (La. App. 1st Cir. 9/19/07), 970 So.2d 1038, 1041-42, writ denied, 2007-2052 (La. 12/14/07), 970 So.2d 535. Accordingly, in order to reverse the trial court's grant of involuntary dismissal, we must find that there is no factual basis in the record for the trial court's finding or that the finding is clearly wrong. Id., 970 So.2d at 1042. See also Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La. 1993).
Because an involuntary dismissal of an action pursuant to Article 1672(B) is based on the "facts and law," a review of the substantive law applicable to the plaintiff's case is necessary. Louisiana Revised Statute 23:967, the LWS, provides in pertinent part as follows:
A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
(1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
(3) Objects to or refuses to participate in an employment act or practice that is in violation of law.
The LWS targets serious employer conduct that violates the law. Puig v. Greater New Orleans Expressway Commission, 2000-924 (La. App. 5th Cir. 10/31/00), 772 So.2d 842, 845, writ denied, 2000-3531 (La. 3/9/01), 786 So.2d 731. A civil action is available as a remedy when an employer retaliates against an employee for making disclosures protected under the statute. La. R.S. 23:967(B). As a condition precedent to protection under the statute, the employee must first advise the employer of the violation of law before making the disclosure. La. R.S. 23:967(A). A violation of the statute occurs if: (1) the employer violated Louisiana law through a prohibited workplace practice; (2) the plaintiff advised the employer of the violation; (3) the plaintiff threatened to disclose or disclosed the prohibited practice; and (4) the plaintiff was terminated as a result of the threat to disclose or because of the disclosure of the prohibited practice. Hale v. Touro Infirmary, 2004-0003 (La. App. 4th Cir. 11/3/04), 886 So.2d 1210, 1216, writ denied, 2005-0103 (La. 3/24/05), 896 So.2d 1036. Thus, Mr. Melancon must prove that the Town committed an actual violation of state law, not just a good faith belief that a law was broken. See Id.
Mr. Melancon set forth several allegations against the Department including protecting drug dealers, preventing officers from doing their job, destroying evidence, and altering reports. Mr. Melancon's allegations were primarily directed against Assistant Chief Michael Foster. During trial, Mr. Melancon testified that he reported his concerns about what he saw to his supervisors, Chief Trabona, Assistant Chief Foster, and Captain Ted Simmons. Mr. Melancon said Captain Simmons told him "if you think members of this department [are] dirty ... get the evidence you need to take them down." According to Mr. Melancon, he perceived Captain Simmons's statement as an order to investigate, so he began running criminal background checks. Eventually, Mr. Melancon contacted the Metropolitan *11 Crime Commission[3] (MCC) about his concerns within the Department. At MCC, he spoke with Mr. Anthony Radosti. Mr. Melancon testified that Mr. Radosti advised him to run the background checks. After speaking with MCC, Mr. Melancon was contacted by the FBI. According to Mr. Melancon, he spoke to the FBI a couple of times, and on July 10, 2009, he was subpoenaed to testify before a federal grand jury. Mr. Melancon contended that his involvement with the FBI was the reason he was terminated. Mr. Melancon admitted that he lied about running the background checks approximately fourteen times, but said he did so to protect the integrity of the investigation. Mr. Melancon acknowledged that he had no documentary evidence regarding the alleged illegal acts of the Department. He also agreed that when Chief Trabona recommended that he be terminated, Chief Trabona only knew that he had run the background checks and lied about it.
Mr. Allen Ordeneaux III, an officer with the Department for nine years, also testified about what he perceived as illegal activity within the Department. Mr. Ordeneaux emphasized the Department's selective enforcement of the law and said he had firsthand knowledge of illegal activity within the Department, but did not provide any documentary evidence. He testified that he only ordered background checks as part of a criminal investigation or traffic stop. Mr. Ordeneaux was also contacted by the FBI after accompanying Mr. Melancon to MCC, and he testified before the federal grand jury. He said he never spoke with Chief Trabona about the investigation by the FBI until several years later. At the time of trial, Mr. Ordeneaux was still employed by the Department.
Chief Trabona testified that Mr. Melancon never complained to him about his fellow officers. Chief Trabona said that Mr. Melancon was terminated for violating the Department's policy for criminal background checks and for repeatedly lying when asked if he had run the background checks. Chief Trabona testified that the fact that Mr. Melancon lied served as the main basis for his termination. Chief Trabona said at the time of Mr. Melancon's termination, he knew nothing about Mr. Melancon's efforts with the FBI, and the Town's decision to fire him was solely based on what he told the Town's council about the background checks and the denials.
In his deposition introduced into evidence at trial, Mr. Radositi testified that after speaking with Mr. Melancon, he provided the information given to him to the FBI. Mr. Radosti said he never asked Mr. Melancon to conduct background checks on members of the Department or deny running them. The Town also introduced the affidavit of Talarah Cataldi, an agent with the FBI who was familiar with the assertions of Mr. Melancon regarding corruption in the Town. In the affidavit, Mrs. Cataldi stated that Mr. Melancon "provided her unsolicited information" and that she did not order or authorize Mr. Melancon to utilize the software belonging to the Town to run criminal background checks or to deny or lie about running those criminal background checks. She also stated that, to the best of her knowledge, no one else at the FBI gave such an order or authorization.
In Captain Simmons's deposition that was introduced into evidence at trial, he stated that he never gave an order to Mr. Melancon to investigate or do criminal background checks, but he acknowledged *12 that when Mr. Melancon came to him with concerns, he told him to do whatever he needed to do or what he felt that he needed to do. Captain Simmons said he was aware that Mr. Melancon had gone to the FBI, but that Mr. Melancon was terminated for running checks on whomever he wanted.
The record reveals that other than a perceived "order" from Captain Simmons, Mr. Melancon was not told or authorized by anyone to run the criminal background checks on members of the Department or to lie when asked about running the background checks. After thorough consideration of the evidence presented by Mr. Melancon, we cannot conclude that the trial court was clearly wrong in finding that Mr. Melancon did not meet his burden of proving the elements necessary under the LWS by a preponderance of the evidence.
Chief Trabona testified that he was not advised by Mr. Melancon of any violation of law by the Department. The evidence supports a finding that Mr. Melancon was terminated for running the background checks and lying about running them, rather than any involvement with the FBI or his disclosure of prohibited practices. Chief Trabona testified that he was not aware of the FBI investigation at the time of Mr. Melancon's termination and recommended his termination solely based on Mr. Melancon running unauthorized criminal background checks and repeatedly lying about it. Additionally, Mr. Ordeneaux, who also testified before the federal grand jury and reported information regarding the Department to the FBI, was still employed by the Department at the time of trial. Considering the evidence, we find no manifest error in the decision of the trial court to grant the judgment of involuntary dismissal in favor of the Town.
CONCLUSION
For the foregoing reasons, the judgment of the trial court granting the Town of Amite City's motion for involuntary dismissal and dismissing Mr. Gerald Melancon's claims is affirmed. All costs of the appeal are assessed to Mr. Gerald Melancon.
AFFIRMED.

Thinkstream is software that was used by the Department at the time of Mr. Melancon's employment to access information from other law enforcement databases via laptops and mobile devices.

Louisiana Revised Statute 42:6.1 was subsequently re-designated as "La. R.S. 42:17" by the Louisiana Law Institute. See 2010 La. Acts, No. 861, § 23.

The Metropolitan Crime Commission (MCC) is a non-profit organization in New Orleans. One of MCC's purposes is to allow citizens to report corruption within law enforcement.