# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-420

**DANELLA TAYLOR SONNIER**

**VERSUS**

**DIVERSIFIED HEALTHCARE-LAKE CHARLES, LLC**

**D/B/A LAKE CHARLES CARE CENTER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2017-2174
HONORABLE DERRICK D. KEE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Ledricka J. Thierry, Judges.

**AFFIRMED AS AMENDED.**

**Edward J. Fonti**
**Jones, Tete, Fonti & Belfour, L.L.P.**
**Post Office Box 1930**
**Lake Charles, LA 70602-1930**
**(337) 439-8315**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Danella Taylor Sonnier**

**Bradley Guinn**
**Daniel T. Price**
**Larry M. Roedel**
**Roedel Parsons Blache Fontana Piontek & Pisano, A L.C.**
**8440 Jefferson Highway, Suite 301**
**Baton Rouge, LA 70809**
**(225) 929-7033**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Diversified Healthcare-Lake Charles, LLC**

**GREMILLION, Judge.**

Defendant/Appellant, Diversified Healthcare Lake Charles, L.L.C., d/b/a Lake Charles Care Center (LCCC), appeals the judgment of the trial court in favor of the Plaintiff/Appellee, Danella Taylor Sonnier. For the following reasons, we affirm as amended.

### FACTUAL AND PROCEDURAL BACKGROUND

LCCC is a nursing home in Lake Charles. Sonnier was employed at LCCC beginning in 2009 and was terminated on May 30, 2016, despite having recently been promoted to the Assistant Director of Nursing (ADON). Sonnier filed suit against LCCC in May 2017, alleging that she was wrongfully terminated because she instructed a co-worker, Tangela Matthews (Matthews), not to alter the date of the onset of a patient's (known as Patient 192) bedsore, at the direction of the Director of Nursing (DON), Tana White (White), resulting in a citation from the Louisiana Department of Health and Hospitals (DHH), which had been conducting a week-long inspection of the facility. Sonnier's petition stated that LCCC terminated her because "Defendant's agents, Ms. White and Mr. Stewart, believed that Plaintiff's cooperation with the Department's agents who conducted the inspection/audit assisted the Department's agents in discovery of deficiencies for which Defendant was cited." An amended petition alleged that she was wrongfully terminated for encouraging Matthews to remove the false record and/or because White and Stewart believed that Sonnier herself had removed the inaccurate record.

In January 2022, LCCC filed a motion for summary judgment, to which was attached the affidavits of Eric Whalen and Brian May stating Sonnier was an at-will employee and that they were never notified by her of any violation of state law, the deposition of Sonnier, Sonnier's petition and first supplemental and amended petition for damages, and the deposition of White. In sum, LCCC argued that there

was no action for wrongful termination because of Louisiana's employment-at-will standard; that the requirements of the Whistleblower Statute were not met; that Sonnier's LUPTA claim failed as a matter of law; that Sonnier's contract-based claims failed; and, that Sonnier's abuse-of-rights claim was without merit.

Following a January 12, 2022 hearing on LCCC's motion for summary judgment, the trial court rendered a judgment on February 11, 2022, finding that there were genuine issues of material fact, that Defendant's objections to the affidavit of Edward J. Fonti and exhibits 1,5,6,10, and 12 were overruled, and that LCCC's motion for summary judgment was denied.

Following a one-day bench trial on February 1, 2022, the trial court gave extensive oral reasons for judgment in open court on February 23, 2023, and awarded Sonnier $458,727.01, finding that LCCC violated the Whistleblower Statute, the Louisiana Unfair Trade Practices and Consumer Protection law (LUTPA), and the abuse-of-rights doctrine. Sonnier, thereafter, filed a post-trial affidavit of her attorney, requesting attorney fees of $104,177.50. LCCC filed an objection to the post-trial affidavit. A judgment was rendered on March 7, 2022, including the award of $104,177.50 in attorney fees. LCCC now appeals.

**ASSIGNMENTS OF ERROR**

LCCC now appeals the interlocutory judgment denying its motion for summary judgment and the final judgment assigning as error:

1. The trial court erred in denying Lake Charles Care Center's motion for summary judgment by admitting incompetent and late-filed evidence.

2. The trial court erred in finding that Sonnier proved all of the elements of her whistleblower claim.

3. The trial court erred in applying the abuse-of-rights doctrine in an employment-at-will termination case.

2

4. The trial court erred in concluding that terminating an at-will employee is an unfair trade practice.

5. The trial court erred in awarding Sonnier attorney's fees when she failed to present any evidence of attorney's fees.

6. The trial court erred in awarding Sonnier legal interest because she did not pray for legal interest and her damages do not sound in tort.

7. The trial court erred in awarding Sonnier an excessive damages award.

8. The trial court erred in calculating Sonnier's lost wages damages.

## DISCUSSION

***Summary Judgment***

At the hearing on the motion for summary judgment, LCCC objected to the introduction of certain evidentiary items relating to procedural issues such as timing and the manner in which they were introduced. LCCC objected to the admission of Exhibit 1, 5, 6, 10, 11, 12, and 13, primarily because they were allegedly not properly admitted through deposition testimony authenticating the documents. As it turns out, all of the documents were LCCC's own documents that were submitted in response to a request for production except for Exhibit 13, which was the written reasons a trial court issued for judgment in a whistleblower case where Sonnier's counsel represented the plaintiff; that judgment was not appealed, so there was no published opinion.

In both her reply brief and amended reply brief, Sonnier states, "LCCC withdrew its objection to all exhibits." She does not cite any place in the record for that claim, and having read the transcript of the hearing, we find no indication that LCCC withdrew its objection. Nevertheless, we find this issue is rendered moot because we find the trial court's denial of LCCC's summary judgment would stand in the absence of these "exhibits," as there were genuine issues of material fact

3

relating to Sonnier's whistleblower claim.  Accordingly, this assignment of error is without merit.

***Whistleblower, LUTPA, Abuse of Rights***

***Is Sonnier a Protected Whistleblower?***

In order for one to obtain whistleblower status for retaliatory firing, La.R.S. 23:967 (emphasis added), the Louisiana Whistleblower Act, provides, in pertinent part:

A. An employer shall not take reprisal against an employee who in good faith, *and after advising the employer of the violation of law:*

(1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.

(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.

(3*) Objects to* or refuses to participate in an employment act or practice that is in violation of law.

B. An employee may commence a civil action in a district court where the violation occurred against any employer who engages in a practice prohibited by Subsection A of this Section. If the court finds the provisions of Subsection A of this Section have been violated, the plaintiff may recover from the employer damages, reasonable attorney fees, and court costs.

C. For the purposes of this Section, the following terms shall have the definitions ascribed below:

(1) "Reprisal" includes firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected under Subsection A of this Section; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such.

(2) "Damages" include compensatory damages, back pay, benefits, reinstatement, reasonable attorney fees, and court costs resulting from the reprisal.

D. If suit or complaint is brought in bad faith or if it should be determined by a court that the employer's act or practice was not in

violation of the law, the employer may be entitled to reasonable attorney fees and court costs from the employee.

We note that the statute does not use "and" or "or" after each subsection, but the consensus is that (A)1-3 are distinct independent alternatives that would be subject to analysis as if "or" had been used at the end of each subsection. See La.R.S. 1:3; La.R.S. 1:9. In the recent case of *Ladd v. Law Enforcement Dist. for Parish of Orleans*, 22-212, pp.4-5 (La.App. 4 Cir. 10/5/22), 350 So.3d 962, 965-66, the court reviewed the statute (emphasis added):

> Louisiana's Whistleblower statute is narrowly tailored and provides protection from reprisal for employees who,
>
> "...after advising the employer of the violation of law:
>
> 1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
>
> 2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
>
> 3) Objects to or refuses to participate in an employment act or practice that is in violation of law."

> La. R.S. 23:967. Four (4) elements are essential, then, for an employee to prevail on a Whistleblower claim. To establish protected Whistleblower status, Ladd must prove that (1) Officer Jacques' involvement in Robinson's escapes was actually *a workplace act or practice* of OPSO; (2) Ladd *advised* OPSO of the principal/escape violation; (3) Ladd either disclosed or threatened to disclose the violation, provided information to or testified before a public investigatory agency in relation to the violation, *or objected to* or refused to participate in *the unlawful actions*; and (4) OPSO retaliated against Ladd as a result. See *Hale v. Touro Infirmary*, 2004-0003, p. 10 (La. App. 4 Cir. 11/3/04), 886 So.2d 1210, 1216.

*Ladd* interpreted subsections 1-3 as offering alternatives for meeting the statute. In *Hale v. Touro Infirmary,* 04-3 (La.App. 4 Cir. 11/3/04), 886 So.2d 1210, *writ denied*, 05-103 (La. 4/24/05), 896 So.2d 1036, relied upon by LCCC and cited by the *Ladd* court, an actual violation of a state law was required; vague and unsubstantiated claims that the defendant violated the Social Work Practice Act

would not be considered sufficient to state a violation of state law. The *Hale* court further elaborated:

> [W]e are bound by the language of La. R.S. 23:967, which provides that an employer may not retaliate against an employee who has notified it of a workplace practice in violation of law and *who either refuses to participate in the practice or who threatens to publicize the practice....* [T]he Whistleblower Statute only offers protection to a specific class of employees: those employees who face "reprisals" from their employers based solely upon an employee's *knowledge* of an illegal workplace practice and *his refusal to participate in the practice or intention to report it.* Therefore, the language of the statute leads us to the conclusion that a violation of law must be established by a plaintiff under the Whistleblower Statute in order to prevail on the merits of the case. We are further convinced of this interpretation in light of the damages clause found in the Whistleblower Statute, La. R.S. 23:967D, which provides for an award of attorneys' fees if a plaintiff brings suit in bad faith *or* fails to prove a violation of law by the employer. We do not casually reach this conclusion, but do so after a full analysis of the legislative history of La. R.S. 23:967.9.
>
> We further agree that the violation of law in question must be that of a state statute. The first subsection detailing under what circumstances an employer may not take "reprisals" clearly states that the employee must be aware of a violation of state law. *The two subsequent subsections prohibit reprisals against employees who not only know of the violation and report it to their employers, but who also testify before public bodies or simply refuse to participate in the illegal activity.* Although the language of the statute is inconsistent, the interpretation that is supported by the structure and that fits best into the framework of the statute is one that holds the statute to its most specific terms, i.e., violations of state law only.
>
> Thus, in order to prevail, [the plaintiff] must establish that (1) [the defendant] violated the law through a prohibited workplace act or practice; (2) she advised [the defendant] of the violation; (3) she then *refused to participate in the prohibited practice or threatened to disclose the practice*; and (4) she was fired as a result of her refusal to participate in the unlawful practice or threat to disclose the practice. Failure to put forth evidence to satisfy any of these elements must result in a summary judgment in favor of [the defendant].

*Id.* at 1215-16 (emphasis added in part) (footnotes omitted).

The *Hale* court omitted mentioning "objecting" as an option to satisfy the statute. In *Kelly v. Dept. of Veterans Affairs,* 21-1605 (La.App. 1 Cir 9/14/22)

6

(unreported opinion) (emphasis added), another recent opinion, though unpublished, the four factors were set forth as:

> Thus, to defeat defendants' Motion for Summary Judgment as to her LWA claim, plaintiff must demonstrate that a genuine issue of material fact exists that: (1) defendants violated Louisiana law through a prohibited workplace practice; (2) she advised defendants of the violation; (3) *she then disclosed or threatened to disclose the prohibited practice or objected to or refused to participate in the prohibited practice*; and (4) she was terminated as a result of the threat to disclose or because of the disclosure of the prohibited practice or her objection to or refusal to participate in the prohibited practice. See *Melancon v. Town of Amite City*, 2018-0442, 2018-0443 (La. App. 1st Cir. 9/24/18), 261 So.3d 7, 10.

The *Kelly* court cited *Melancon v. Town of Amite City*, 18-442, 18-443 (La.App. 1 Cir. 9/24/18), 261 So.3d 7. In *Melancon*, the requirements are phrased differently:

> As a condition precedent to protection under the statute, the employee must first advise the employer of the violation of law before making the disclosure. La. R.S. 23:967(A). A violation of the statute occurs if: (1) the employer violated Louisiana law through a prohibited workplace practice; (2) the plaintiff advised the employer of the violation; (3) *the plaintiff threatened to disclose or disclosed the prohibited practice;* and (4) the plaintiff was terminated as a result of the threat to disclose or because of the disclosure of the prohibited practice.

*Id.* at 10 (emphasis added). The *Melancon* court did not mention the option of objecting or refusing to participate but relies on disclosure.

In *Derbonne v. State Police Comm'n*, 19-1455 (La.App. 1 Cir. 10/14/20), 314 So.3d 861, *writ denied*, 20-1323 (La. 2/17/21), 310 So3d 1152, the court was faced with the issue of whether a person who must report as part of their job can be protected under the Whistleblower Statute. Derbonne was a state employee who reported violations of law to the State Police Commission, the Governor, the Legislative Fiscal Office, and the Louisiana Board of Ethics. In summarizing the purpose and requirements of the statute, the court stated:

> The Louisiana Whistleblower Statute protects employees against reprisal from employers for reporting or refusing to participate in illegal work practices. The statute targets serious employer conduct that violates the law. *Causey v. Winn-Dixie Logistics, Inc.*, 2015-0813 (La.

7

App. 1 Cir. 12/23/15), 186 So.3d 185, 187, *writ not considered*, 2016-0167 (La. 3/24/16), 190 So.3d 1187. The plaintiff must establish an actual violation of state law under the Louisiana Whistleblower Statute in order to prevail on the merits of the case. *Accardo v. Louisiana Health Services & Indent. Co.*, 2005-2377 (La. App. 1 Cir. 6/21/06), 943 So.2d 381, 386. A violation of La. R.S. 23:967 occurs if (1) the employer violated Louisiana law through a prohibited workplace *practice*; (2) the plaintiff advised the employer of the violation; (3) the plaintiff *threatened to disclose or disclosed the prohibited practice*; and (4) the plaintiff experienced a reprisal as a result of the threat to disclose or because of the disclosure of the prohibited practice. *Dobyns v. University of Louisiana System*, 2018-0811 (La. App. 1 Cir. 4/12/19), 275 So.3d 911, 926, writ denied, 2019-00950 (La. 9/24/19), 278 So.3d 977.

*Id.* at 870 (emphasis added). The court did not list "objecting" as an option, but Derbonne had already disclosed it to numerous outside agencies.

In *Loya v. Lucas*, 16-220, p.7 (La.App. 4 Cir. 9/21/16), 201 So.3d 928, 933 (emphasis added), the requirement was set forth as:

The Whistleblower Statute only offers protection to a specific class of employees: those employees who face "reprisals" from their employers based solely upon an employee's knowledge of an illegal workplace practice and *his refusal to participate in the practice or intention to report it. Id.*, 04-0003, p. 8, 886 So.2d at 1215.

This language appears to indicate that no disclosure is necessary as long as the employee *intends* to disclose *or* refuses to participate.

In *Accardo v. La. Health Servs. & Indem. Co.*, 05-2377 (La.App. 1 Cir. 6/21/06), 943 So.2d 381 (emphasis added), the court undertook an in-depth analysis of statutory construction to determine the meaning of "good faith" in the statute. In deconstructing the meaning the court referred to:

The remaining part of Section A sets forth *three different employee actions* that are protected under the statute (referred to as the "disclosure activities"). We note that each of the Louisiana Whistleblower Statute's three specific *disclosure activities* refers to the "violation of law" in very specific terms and does not include any reference to the employee's good faith or reasonable belief that the workplace act or practice is a violation of law.

*Id.* at 385 (emphasis added).

The *Accardo* court referenced "disclosure activities." Disclosing is not the same as "objecting." LCCC heavily relies on Sonnier's failure to disclose to someone outside of LCCC, to report to an authority, or tell someone at DHH while they were there conducting the survey. Based on our review of the jurisprudence, and a plain reading of the statute, we conclude that the plaintiff need not "disclose" outside of the workplace if one of the other three "disclosure activities" has been met under the statute. The statute clearly states that "object[ing] to . . . an employment act or practice that is in violation of the law," is sufficient to meet the "disclosure activity" portion of the statute. La.R.S. 23:967(A)(3). Considering the jurisprudence, this is the minimal level that must be met.

Sonnier is protected under the Whistleblower Statute if 1) she advised LCCC of a violation of law that was a workplace act or practice; 2) she objected to the illegal activity, and 3) she was retaliated against for doing so.

The trial court's factual findings are subject to manifest error review. *Ladd*, 350 So.3d 962. In its oral reasons for judgment (emphasis added), the trial court found:

> White, who was the director of nursing, acted on behalf of Lake Charles Care Center when she instructed Tangela [Matthews] to, quote/unquote, "fix" resident 192's medical records. . . .the term "fix" meant falsifying patient 192's records to show that she received the ulcer before she was a resident at Lake Charles Care Center.
>
> The evidence shows that Defendant devised a plan and this plan was to avoid detection by the Louisiana Department of Health. . .
>
> It is evident that White acted on Defendant's behalf and not just her own. She acted for and as an agent and for the benefit of Lake Charles Care [Center].
>
> The Defendant was advised against its illegal scheme *when [Matthews] told White that the Plaintiff, Ms. Sonnier, insisted that she not falsify the note.*
>
> Furthermore, Ms. Sonnier told White *directly* that falsifying 192's medical records was unlawful and dishonest. Specifically, she

cautioned Ms. White *herself not to violate the law of licensing protocol*. Defendant's action was obvious[ly] a violation of state law, including but not limited to, forgery or attempted forger[y] under Louisiana Revised Statute Article 14:72, as well as abuse and neglect of adults under Louisiana Revised Statute 403.2, and unfair trade practices, amongst others.

As a result of White's illegal demands, Ms. Sonnier refused to participate before and after she spoke to White. *Ms. Sonnier could not have reported White's plan even if she wanted to.* According to her testimony, *she couldn't have failed to report it, because she had already reported it to White.* She could have – she didn't have an opportunity.

It is no coincidence that Defendant terminated Ms. Sonnier the next full workday after the State completed its inspection. Clearly, her only mistake, Ms. Sonnier's was her refusal to cooperate with this unlawful, illegal scheme.

. . .

Defendant tried to deceive the Department of Health, and that did not work. Defendant tried to deceive Ms. Sonnier, and that did not work. Defendant will certainly not deceive this Court.

### Testimony at the February 1, 2022 hearing

*Danella Sonnier*

Sonnier, who was forty-three years old at the time of trial, testified that she worked at LCCC originally from October 2003 through March 2009 in various nursing positions. She resumed working at LCCC in November 2009, and worked there until May 30, 2016, when she was terminated. Regarding Patient 192, Sonnier testified that Matthews was Patient 192's treatment nurse. Sonnier said that DHH began its survey on May 23, 2016, and that five surveyors from the state conducted the audit. Sonnier said she was questioned by a state surveyor regarding the absence of heel protectors for the prevention of pressure sores on Patient 192.

Sonnier then recalled being in her office with other employees of LCCC, including White, when Matthews entered the room and began explaining the situation relating to Patient 192. Sonnier said that White told Matthews "she needed to fix it." According to Sonnier, this event occurred a few weeks prior to the arrival

10

of the DHH auditors. Sonnier said that during the week of the survey, Matthews came into her office and said that it had been brought to her attention that the dates in Patient 192's record had discrepancies relating to when the pressure sore on Patient 192's heel developed. Sonnier said that Matthews reported that White told her to "fix the record" to show that the patient had been admitted with a pressure ulcer. Matthews did not feel comfortable leaving an "amended note" in the patient's record because White had never replaced the note as she said she would. This resulted in conflicting dates because the admission assessment that was in Patient 192's records still showed that she did not have a pressure sore upon arrival on April 25, 2016, whereas the nurse's notes showed a wound listed on the April 25, 2016, and there was also a note that showed that the wound developed on April 28, 2016. Sonnier testified that she told Matthews:

> And so what I told [Matthews] was, I understand that [White] is our boss. She is the DON. [White] is our supervisor. However, just like you worked for a license, she worked for a license. We all had to work through school to get a license. And so her license is no more important than your own. If she told you that was going to falsify the document or she was going to change it and she didn't then she's pretty much leaving you out here by yourself to have this false record placed into this resident's charge. I personally would not leave anything like that because the DON who told me that she would have supported me acutally had not. I'm going to leave that totally up to you at the end of the day [the] State could very well find this false document and reach out to the Louisiana Department of Practical Nurse Examiners to have your license reviewed.

Sonnier said that she subsequently had a conversation with White during DHH's survey after White had been inquiring of the employees where the note indicating that Patient 192 was admitted with the wound was, and Sonnier said:

> And what I told her was, it was not right to do that. It wasn't going to make a difference at the end of the day. The resident had the decubitis, they saw that there was multiple issues with the resident, from not having the preventative measures to being treated with a medication that she was allergic to, so there was no point.

Sonnier then testified that at the end of the survey on Thursday, May 26, Eric Whalen, the chief operating officer, said that they were to have the day off on Friday, May 27, 2016, because everyone had worked really hard. On Monday, May 30, 2016, Sonnier was called to the DON's office with White and Scott Stewart, the administrator, and she was let go. Sonnier requested that she be demoted instead but was told her "services were no longer needed." She said she had just been promoted to ADON in January 2016. Sonnier then described the financial hardship she endured following the termination, such as having her car repossessed and missing mortgage payments.

Sonnier was then shown medical records received from LCCC subsequent to the filing of the lawsuit indicating that on April 28, 2016, a pressure ulcer the size of a lemon was noted next to a line describing "onset date" and a check mark next to a line stating, "facility acquired." Sonnier was then shown a 1032 wound assessment record dated April 25, 2016, noting the pressure sore the size of a lemon with various notes about who was contacted and the treatment plan. The 1032 record was unsigned. Sonnier said the document was incorrect because Patient 192 was not diagnosed until April 28, 2016, and it was documented on her admission assessment that she had no wounds on April 25, 2016. Sonnier was further shown a treatment record indicating that Betadine was to be applied to the deep tissue injury to the left heel with the date of 4/28/16 but that the number five had been written over the eight.

Sonnier was questioned on cross-examination if she reported the discrepancy to the compliance officer as the employee handbook states, but she said she did not know who that was. However, she did report it to White, the DON. She was questioned (emphasis added):

Q. What did you report to her?

A. So what we discussed was the document in question that she was asking [Matthews] to fabricate and me telling her that we shouldn't have even made the document, because it wouldn't have done any good. It wouldn't have made any difference as it related to patient care, citations, or anything of that sort.

Q. When did you have that conversation?

A. During the week of survey. After it was brought to my attention by Ms. Matthews.

Q. Here's--Here's my confusion. If it's a record keeping issue you get a tag, correct?

A. Correct.

Q. If it is a failure to timely put in place a treatment plan you get a tag, correct?

A. Yes.

Q. Under either of those scenarios is the result an in-service training session?

A. It depends on your plan of action.

Q. Okay.

A. But that same justification is what I was explaining to Ms. Matthews when she was asking Ms.—I'm sorry, it's the same thing that I was explaining to Ms. White, that it didn't matter if the document was there or not. So that was a conversation that I had with her as well. It would have still have been a citation. Because essentially the resident still had some deficiency in care. If you acutally look at the 2567 you see notation where the surveyor acutally documented herself that she spoke with S-1 LPNADON, which was myself, in regards to her not having heel protectors on in the room. So we still would have gotten a citation for negligent care.

Q. In your experience if a nurse believes that there's an error in a resident's record is there a responsibility to try to correct that error?

A. Yes, and there's a way to do that as well. So you wouldn't wright [sic] over a number. You would acutally draw a line through whatever the error is, write the word "void" next to it, and then initials so that the individuals would know if something was written in error. That's the proper way to write it. That's how we are taught in school.

Later she was asked:

13

Q. So if you believe that there was improper conduct going on, why not report that to Scott Stewart or Eric Whalen?

A. So to be honest –

Q. Please.

A. –during the – and I'm going to say, for lack of a better term, during the [White] and Scott Stewart era, [White] and Scott had a very close work relationship. And so for me to report that my supervisor who was in a close relationship, work relationship, with her supervisor, Scott Stewart, would put me in a situation to *where I could possibly be terminated*. So if I tell Scott then he would tell [White], *I would be wrote up or terminated*. And as you can see in the records, I had not had any disciplinary action since 2011. It had been five years. So there was no telling him.

Mr. Eric, sometimes he was there, sometimes he was not. But most times when he was there he spent most of his time in Scott's office. So just the fact of being afraid of even mentioning anything to Scott, I for sure was not going to mention anything to Scott in front of Eric. There was no conversation that was unheard in the facility. Everybody knew almost everything, except for the reason why Danella was terminated. That was the only thing in Lake Charles Care Center that stayed hush. But everything else was open knowledge for of the witnesses that are in here today.

Q. Whether I agree or disagree with what you just said, let me ask you this question, why not notify the survey team of your complaint?

A. No.

Q. Why not put – go ahead, I'm sorry.

A. No, you go ahead. I'll let you finish. I apologize, I cut you off.

Q. If you truly believed that there was improper conduct going on why not put that in writing to the Department of Health, to the Louisiana Workforce Commission, to the Attorney General's Office, to somebody if you felt like you couldn't go to [White]?

A. How do you prove it? You know? In order for us to be able to get access to those documents, I mean, we would have had to – or I would have had to sneak around to get access to them, that's number one.

Number two, I had been in the nursing home industry off and on since '98. You did not volunteer and you still to this day do not volunteer extra information to a State Surveyor. It is frowned upon in the facility. You will be fired. And as a direct example of that awareness, Tana White and Scott Stewart on June 5th, after my termination, made sure to mention to the staff, staff who are also in

this room now, that you are not friends with the State. You do not have a casual relationship with the State. You do not discuss anything with the State. That was a directive given by our supervisors. You don't tell the State anything other than the basics of what they ask you for.

So no, I couldn't just tell the auditors that [White] was trying to coerce [Matthews] to falsify documentation.

Q. So if [Matthews] admits that she's the person that made the mistake and she took it on her own to correct the mistake, you're saying she's lying?

A. I don't believe [Matthews] said that. I believe that in regards, as I think about it, in regards to some of that deposition, what we did discuss was the timeline of resident events that was located in my personnel file, which was definitely out of sorts, and her saying she didn't recall writing it or why it was written.

Now as far as making an error or making a mistake, I don't remember that. But I do know that when she and I talked in my office that day she verbalized that [White] had asked her to change the document and that [White] would also supplement the patient's record with a falsified document. That was not the word she used, "falsified," but the description, yes, was a falsified document.

Q. So if there's 13 pressure sores –

A. In the facility, yeah.

Q. Okay. Why would people put their licenses at risk to cover up one of 13? That makes – that does not make logical sense to me.

A. It doesn't. It does not.

And I will say this, that it is not uncommon practice for a supervisor, especially a director of nursing, *it has not been uncommon practice for her to ask people to alter documentation, especially in regards to Ms. White. That is not uncommon. She has asked people to do that before, whether it was related to pressure areas or people passing away, it – she has.*

So no, she – she would never openly admit to that. *None of us would.* It would actually put us at risk of jeopardizing our own licenses. But yes, *we have been asked at different times to change documents by supervisors. That was not uncommon practice.*

*Margentina Carter*

Carter testified that she was employed at LCCC from 1998 through 2019 and was a case manager at the time of the incident in question. Carter was questioned about the record keeping regarding Patient 192:

> Q. …during the survey did you have a conversation with the DON, the director of nursing, Tana White, concerning the patient 192 [?]
>
> A. Yes.
>
> Q. When did that conversation take place?
>
> A. The one I can remember on 192 was she came in my office and she asked me about my care plan. She told me I had my dates wrong and I had to – I needed to change it or review it. And when I looked at it, it was because I had did an addendum on it saying . . . – Ms. 192 had developed an ulcer on her heel on 4/28.
>
> Q. And what was – what does it matter with that date?
>
> A. She wanted – she actually was saying that it happened on 4/25, she came in with it. And I told her, no, I got the orders – because I – everytime we come in we pick up all the doctor's orders, we look through the nurse's notes to see if there's any changes on our skilled residents. Nothing showed up of her having a wound until 4/28.
>
> Q. So did you believe that your 4/28 date was accurate?
>
> A. Yes.
>
> Q. But Ms. – the DON, Ms. White, stated –
>
> A. Ms. [White] –
>
> Q. – nope, it's not accurate?
>
> A. Yes. She said that I had it wrong. I needed to change it to 4/25. And I told her as far as the documentation goes, and because Ms. Carlin, which was the nurse, she's very meticulous in her assessments, she did not see any ulcer on her heel, she did not note it. So I – I couldn't – I wasn't changing my care plan.
>
> Q. And you told her that?
>
> A. Yeah.

Carter then recounted a time in a conference room with Mickey Foster, who called the nurse, Ms. Carlin, and asked her to come in and change the date on her records to reflect that there was a pressure sore on April 25, the date the patient was admitted. However, Carlin appeared to have declined because Carter heard Foster saying, "So you're not coming up here? You're not changing that?" Carter also testified that Matthews asked her what to do about changing the date, but Carter told her to ask Sonnier. Carter testified that changing the date would have conflicted with her paperwork and thrown everything off. Carter noted on cross-examination that she was Sonnier's cousin.

*Tangela Matthews*

Tangela Matthews testified that she recalled the conversation she had with Carter and recalled telling her that she was concerned about writing the note that White had asked her to, which would be submitted to the DHH surveyors. She testified she talked to both Carter and Sonnier about this situation. However, she stated that she erroneously put the 26th when she should have put the 28th. She was asked about the 1022 document with the "5" written over the "8" but denied being the person who wrote it. She was asked:

> Q. Did Ms. White ever, during the survey – or maybe even before the survey, talk to you about changing dates on documents so that the surveyors would decide that the ulcer was on patient 192 heel on the date that she was admitted into the facility?
>
> A. Yes.
>
> Q. She did suggest to you that you change dates on documents?
>
> A. We had a conversation about whether the wound occurred on the date of admission or the date that was in the record, yes.
>
> Q. And didn't she instruct you to change some documents so that it would appear to the surveyors that the ulcer was on the left heel on 4/25.
>
> A. I was asked to fix it.

Q. Fix it. And fix it means change the dates?

A. Correct it, fix it.

Q. Yeah. And that's what Ms. White told you to do.

A. Yes.

Q. All right. Now, you were new on the job right?

A. Correct.

Q. And she's the top boss out there at that time.

A. Yes.

Q. So the top boss was telling you to change dates and you agreed to do that?

A. No.

Q. You didn't?

A. No.

Matthews went on to state that she mistakenly wrote "28" when she should have written "26." She admitted duplicating the 4/28 note and dating it 4/26. She testified:

Q. All right. And so it was just a mistake, inadvertent mistake, that caused you to duplicate what you had already documented as happening on 4/28 on this noted [sic] dated 4/26?

A. Correct.

Q. That's your testimony?

A. Correct.

Matthews continued to testify that White asked her to "fix" the date, or "change" it, but it was due to her own error. Matthews stated she removed the record dated 4/26 from the file. When asked why she removed it, she testified, "Because the discrepancies in the date from the physician order to the beginning of treatment and the nurse's record." She reviewed the document dated 4/28 that she filled out,

then reviewed another document dated 4/25 that she also filled out but did not sign, and finally said she mistakenly wrote 4/26 on a document. Matthews essentially testified that she made many dating "mistakes." However, she ultimately concluded that the 4/28 note was correct, that she had written a note dated 4/26, and:

> Q. You then became aware that a survey team might catch the difference between those two dates.
>
> A. Correct.
>
> Q. That was a concern of yours and it was a concern of Tana White's, correct?
>
> A. Correct.
>
> Q. All right. So did you not, as you said in your deposition, you took it on your own to fix it by removing the April 26th note, correct?
>
> A. Correct.
>
> Q. Somehow that note ended up either in your office or somebody else's office during the survey of May 23 through May 26.
>
> A. Correct.
>
> Q. Tana White asked you, where's the note?
>
> A. Yes.
>
> Q. You retrieved the note from an office and I think you put it in your pocket, correct?
>
> A. Yes.
>
> Q. So then there's a conversation that goes on between you and [White] and maybe [Foster's] there too, I don't know.
>
> A. Maybe.
>
> Q. But what to do with this note in your pocket.
>
> A. Right.
>
> Q. And the conclusion was, if you drop it back in the chart now that ain't going to look good to the survey team.
>
> A. Correct.

She then testified that she thew away the note.

*Tana White*

White testified she was the director of nursing at the time and typically was in charge of 150 patients and 100 or more employees. She was asked if she told anyone to alter Patient 192's records, to which she responded, "No, not alter in a negative manner." She admitted there was a discussion about making sure that Patient 192's chart was "correct." White had no recollection of anything said or done during the meeting relating to Sonnier's termination.

*Analysis*

We now turn to an analysis of the four prongs required of the Whistleblower statute.

**1) *Violation of the law that is an employer workplace act or practice: Forgery***

LCCC focuses the majority of its brief on the firing itself as being the illegal act alleged by Sonnier. LCCC goes into great detail describing the timing of a whistleblower claim and stating that the firing itself cannot be the alleged violation of law.[1] Sonnier's initial petition stated the claim as:

21.

Defendant terminated Plaintiff in retaliation for Plaintiff having instructed an employee not to alter a medical record in a way which would result in the Department of Health and Hospitals not discovering the deficient record.

22.

Defendant terminated Plaintiff because Defendant's agents, Ms. White and Mr. Steward, believed that Plaintiff's cooperation with the Department's agents who conducted the inspection/audit assisted the Department's agents in discovery of deficiencies for which Defendant was cited.

23.

_____

[1] The issue of the firing as a "violation of law" under LUTPA that would satisfy the Whistleblower Act requirements will be discussed below.

The termination of Plaintiff was wrongful, illegal, and in violation of State and Federal laws, including La.R.S. 23:967 [The Whistleblower Act] and LA.R.S. 40:2009.17.[2]

In her first supplemental and amended petition for damages, Sonnier added that White and Stewart were authorized agents of LCCC and the following:

8.

By amending Paragraph 13 to read:

"During the week long inspection/audit Plaintiff was approached by a staff LPN who explained that she (the LPN) had been instructed by the Director of Nursing, Ms. White, to write a false admission report in regard to a patient (identified in the State audit as patient 192), and to place the false report in patient 192's medical records. The Director of Nursing instructed the LPN to write the false report to 'cover-up' the fact patient 192 developed a pressure ulcer on her left heel while patient 192 was under the care of the facility."

9.

By amending Paragraph 14 to read:

"The LPN explained to Plaintiff her concern resulting from having written a false medical report and placing it in patient's medical records that would be reviewed by Department auditors."

10.

By amending Paragraph 15 to read:

"In response to LPN's expressed concerns, Plaintiff informed the LPN that she (Plaintiff) would not submit the false medical report to the Department auditors, and informed the LPN that she (the LPN) could lose her LPN license if she submitted the false report to Department auditors."

11.

By amending Paragraph 16 to read:

---

[2] La.R.S. 40:2009.17 addresses retaliation by a health care provider:

No discriminatory or retaliatory action shall be taken by any health care provider or government agency against any person or client by whom or for whom *any communication was made to the department* or unit, provided the communication is made in good faith for the purpose of aiding the office or unit to carry out its responsibilities. Any person who knowingly or willfully violates the provisions of this Section shall be guilty of a misdemeanor and upon conviction punished by a fine of not less than one hundred dollars nor more than five hundred dollars.

"After receiving Plaintiff's opinion/advice, the LPN removed the false report from patient 192's medical records before the medical record of patient 192 were [sic] submitted to a Department Auditor for review."

12.

By amending Paragraph 17 to read:

*"Because the false report was removed from the medical records of patient 192 before the records were submitted to a department auditor*, the Department correctly cited Defendant for having allowed a pressure ulcer to have developed on 192's left heel while the patient was under the care of the facility."

13.

By amending Paragraph 20 to read:

"Plaintiff met with Administrator Scott Stewart and Director of Nursing Tana White, who were acting as agents for Defendant, who informed Plaintiff that her services were no longer needed and that she was terminated from employment with Defendant. Plaintiff was not given a reason why her services were no longer needed nor why she was terminated."

14.

By amending Paragraph 21 to read:

"Defendant terminated Plaintiff because Director of Nursing White and Administrator Stewart believed that Plaintiff had advised/instructed/encouraged the LPN to remove the false medical report from patient 192's records and/or because Ms. White and Mr. Stewart believed that Plaintiff had actually removed the false medical report from patient 192's medical records."

15.

By amending Paragraph 23 to read:

"The termination of Plaintiff was wrongful, illegal, and in violation of State and Federal laws, including but not limited to La.R.S. 23:967, La.R.S. 40:2009.17, La.R.S. 51:1401 *et seq*,[3] La.C.C. art

---

[3] La.R.S. 51:1401 *et seq.* is the Louisiana Unfair Trade Practices and Consumer Protection law.

22

1759[4] and 2024[5], a violation of the Louisiana 'Abuse of Rights Doctrine', Louisiana Administrative Code Title 46 Part XLIX § 1105A.2.a.i. and c.iv.,[6]and Louisiana Administrative Code Title 46 Part XLVII § 306.T.8.i[7]"

The trial court relied on "forgery or attempted forger[y] under Louisiana Revised Statute Article 14:72, as well as abuse and neglect of adults under Louisiana Revised Statute 403.2," although neither of these is mentioned in Sonnier's petitions as the alleged violations of law. Nevertheless, Louisiana is a fact pleading state and Sonnier does assert facts that could be deemed a forgery, a violation of law.

Louisiana law defines forgery in La.R.S. 14:72 as:

A. It shall be unlawful to forge, with intent to defraud, any signature to, or any part of, any writing purporting to have legal efficacy.

B. Issuing, transferring, or possessing with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute a violation of the provisions of this Section.

C. For purposes of this Section:

(1) "Forge" means the following:

(a) To alter, make, complete, execute, or authenticate any writing so that it purports:

(i)     To be the act of another who did not authorize that act;

(ii)    To have been executed at a time or place or in a numbered sequence other than was in fact the case; or

(iii) To be a copy of an original when no such original existed.

---

[4] La.Civ.Code art. 1759 relates to the performance of obligation in good faith and states: "Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation."

[5] La.Civ.Code art. 2024 states that "A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party."

[6] These titles relate to rules governing Nursing Facility Administrators such as hearings relating to licensure when the Administrator has failed to act in accordance with the rules.

[7] This section relates to adjudication proceedings for disciplinary actions against practical and registered nurses.

(b) To issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged in accordance with the meaning of Subparagraph (1)(a).

(c) To possess a writing that is forged within the meaning of Subparagraph (1)(a).

(2) "Writing" means the following:

(a) Printing or any other method of recording information;

(b) Money, coins, tokens, stamps, seals, credit cards, badges, and trademarks; and

(c) Symbols of value, right, privilege, or identification.

D. Whoever commits the crime of forgery shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, for not more than ten years, or both.

Using a manifest error standard, we find that the trial court did not err in concluding that Matthews forged a document at the behest of White. We note, though, that the forged document was removed. In addition to being an actual violation of state law, the violation of state law must be a workplace act or practice that can be attributed to the employer rather than a rogue co-employee. *Ladd,* 350 So.3d 962. The act or practice must be condoned by the employer, such that it can be attributed to the employer. *Id.* The LWA targets "serious employer conduct that violates the law." *Causey v. Winn Dixie Logistics, Inc.,* 15-813, p.4 (La.App. 1 Cir. 12/23/15), 186 So.3d 185, 187.

We find the trial court did not err in concluding that the forging of patient records was a workplace act or practice attributable to LCCC. Matthews testified that White asked her to alter records; Carter testified that Foster asked Carlin, the nurse, to come in and change the date on her records to reflect that Patient 192 had a pressure sore on April 25, but she declined. Carter also said that Matthews asked her what to do about changing the date, but she referred Matthews to Sonnier.

24

Sonnier herself testified that it was commonplace for White to request that other people change records. The trial court obviously found this testimony credible, and we find no manifest error in its finding. Systemic falsification of patient medical records in order to pass DHH inspections is serious misconduct that violates the law and jeopardizes the health of Louisiana's most fragile residents. Accordingly, the trial court did not err in finding a workplace practice that violated the law, i.e., the forging of patient records to avoid negative treatment by DHH.

2) *Did Sonnier advise employer of the crime?*

LCCC argues that this prong was not met because Sonnier did not notify LCCC of the violation. It is true that in its opposition to LCCC's MSJ, Sonnier stated:

> In regard to the issue of notification to her employer, Sonnier will prove that certain factual circumstances of this case caused it to be *impossible for her to advise her employer of the illegal scheme*. This is so because White kept secret the scheme and the implementation of the scheme. Sonnier was not aware of its existence until Matthews told Sonnier, on the same day (May 25, 2016) that the Department was requesting patients 192's file[.]
>
> . . . .
>
> Another material factual finding that may cause the Court to determine the failure to notify is of no consequence to the validity of Sonnier's Whistleblower claim is that "notification" to White was not only impossible, notification would have served no purpose. This is so because White was the architect of the illegal plan. She (White) knew about her plan from the very day it was implemented. Thus it was impossible for Sonnier to advise White of an illegal work practice that White devised and implemented.

Sonnier testified that she did not report to Stewart because of the "work relationship" between White and Stewart, stating that she would be fired if she told Stewart. She testified that she did not report to Whalen because he was always in Stewart's office. The trial court found that the notice requirement was satisfied, although its reasoning is unclear. Regardless, we find that notifying White, even

25

though White was the person instigating the violation of law, sufficed. Sonnier did, in fact, approach White and tell her that what she was doing was wrong and jeopardized Matthews' license if DHH became aware of the falsified record. Sonnier then explained to White that it did not matter anyway because LCCC would be cited for a violation regardless. The statute requires that the whistleblower notify the employer of the act or practice that can be attributed to the employer. La.R.S. 23:967. If the act or practice is of such a significant nature that it can be attributed to the employer, a high-level manager of hundreds of employees in close contact with the top two persons of the organization qualifies as a person susceptible of being given notice. The trial court did not err in finding that the notification prong has been satisfied.

### 3) *Did Sonnier Disclose, Testify, Object, or Refuse to Participate?*

On this issue, we find the law varies on what is actually required. A classic whistleblower case typically involves disclosure or threats to disclose to some outside agency or the press. LCCC indeed relies on the disclosure language used in many cases to argue that this prong was not satisfied. It is undisputed that Sonnier was never asked to participate and, therefore, could not refuse to, nor did she ever threaten to disclose. Moreover, it was clear from the record that Sonnier would have never disclosed to DHH as she testified that it was an industry practice to only answer questions asked by DHH employees and because there would not have been any way to prove the claim she was making.

However, a plain reading of the statute and some jurisprudence indicates that "objecting" is enough to satisfy the "disclosure" portion of the statute. *See* La.R.S. 23:967(3), *Kelly* (an unpublished opinion). Until the legislature clarifies otherwise, this prong of the statute only requires that Sonnier "objected" to the behavior that violated state law. On this count, we find no manifest error in the trial court's finding

26

that Sonnier objected by telling Matthews not to do it and by telling White that it was wrong.

**4)** *Did LCCC retaliate?*

We find no error in the trial court's finding that Sonnier was fired in retaliation for objecting to White's requests. This is evident from the timing of her termination following Whalen giving everyone the day off for doing such a good job, and the deposition testimony of Whalen. Whalen, in deposition testimony, when asked about his conversation with White and Stewart relating to Sonnier's termination:

> What I can recall, the information that was provided to me, was that during a State survey, that Danella had removed a wound care report that had been completed by Tana White, the RN, on a resident's wound that Danella did not agree with. And she went on her own and pulled the documentation out of the chart, which showed that the facility did not have proper documentation for this wound.
>
> And based on that information, they told me that she interfered in a State survey process. That was the information they gave me, which led to her termination.

This explanation is simply unsupported by the record and was untruthful testimony by White, Stewart, or both of them. Accordingly, we find the fourth prong of the statute was satisfied.

Even from a cold record, Matthews' and White's lack of credibility was painfully obvious. We have no doubt that the events transpired just as Sonnier testified. We find no manifest error in the trial court's finding that Sonnier was a protected whistleblower under the statute. Sonnier certainly objected to the behavior, notified LCCC of this particular act of a violation of state law amounting to forgery, and was retaliated against for doing so. Assignment of error two is without merit.

*Abuse of Rights*

LCCC argues there can be no abuse of rights because of employment at will. We address this argument as it bears on issues relating to damages. The doctrine of

27

at-will employment has had a strong foothold in Louisiana law for over 200 years. La.Civ.Code art. 2747.[8]  Simply, an employer can terminate an employee for any reason even if it is inaccurate, unfair, or unreasonable.  *Huang v. La. State Bd. of Trustees*, 99-2805 (La.App 1 Cir. 12/22/00), 781 So.2d 1.  The only exceptions are for reasons such as race, sex, or religious belief or otherwise protected civil rights. *Fletcher v. Wendelta, Inc.*, 43,866 (La.App. 2 Cir. 1/14/09), 999 So.2d 1223, *writ denied*, 09-387 (La. 4/13/09), 5 So.3d 164.  There are no broad policy considerations creating exceptions to employment at will.  *Hayes v. Univ. Health Shreveport, LLC*, 21-1601 (La. 1/7/22), 332 So.3d 1163.

In *Hayes*, the Louisiana Supreme Court recently addressed the employment-at-will doctrine in relation to an employer's requirement that its employees be vaccinated against COVID-19 or face disciplinary action:

> "The employer-employee relationship is a contractual relationship." *Quebedeaux v. Dow Chem. Co.*, 01-2297, p. 4 (La. 6/21/02), 820 So.2d 542, 545.  "As such, an employer and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy." *Id.*, 01-2297 at 4-5, 820 So.2d at 545. "When the employer and employee are silent on the terms of the employment contract, the [Louisiana Civil Code] provides the default rule of employment-at-will." *Id.*, 01-2297 at 5, 820 So.2d at 545.  "This default rule is contained in LSA-C.C. art. 2747," which has been in the Civil Code since 1808–over 213 years.  This code article sets forth the fundamental framework for Louisiana's at-will employment doctrine—which means that, generally, "an employer is at liberty to dismiss an [at-will] employee at any time for any reason." See *Quebedeaux*, 01-2297 at 5, 820 So.2d at 545.  Reciprocally, at-will employees are at liberty to leave the employment to seek other opportunities for any reason or no reason at any time.
>
> However, an employer's right to terminate an at-will employee "is tempered by numerous federal and state laws which proscribe certain reasons for dismissal of an at-will employee." *Quebedeaux*, 01-2297 at 5, 820 So.2d at 545.  As long as the termination does not violate any statutory or constitutional provisions, the employer is not liable for wrongful termination.  For example, laws prohibit discrimination against anyone based on "race, sex or religious beliefs," and protect

---

[8] La.Civ.Code art. 2747 provides:  "A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reasons for so doing.  The servant is also free to depart without assigning any cause."

28

employees from termination "for exercising certain statutory rights." See *id.*, 01-2297 at 5, 820 So.2d at 545-46 & nn.8 & 9 (citing 42 U.S.C.A. § 2000e, et seq.; 42 U.S.C.A. § 1981; La. R.S. 23:301, et seq.; La. R.S. 23:1361). "Aside from [these limited] federal and state statutory exceptions, there are no broad policy considerations creating exceptions to employment at will." *Id.*, 01-2297 at 5, 820 So.2d at 545-46.[9]

*Id.* at 1168-69.

Terminating an at-will employee is virtually never an abuse of rights. For example, in *Walther v. National Tea Co.*, 848 F.2d 518 (5th Cir. 1988), the abuse of rights doctrine was inapplicable where two at-will employees were terminated shortly before the vesting of their pensions because the exercise of the legal right (termination at will) benefitted the employer (not having to pay the employee's pensions). The first prong of the abuse of rights test requires a benefit to the employer however it is prefaced by the phrase:

> To cast a party "in damages for exercising a right legally conferred upon him there must exist (1) no benefit to the person exercising the legal right and (2) damage or injury to the person against whom the legal right is asserted." [*Lambert v. Maryland Cas. Co.*, 403 So.2d 739, 757 (La.App. 4 Cir.1981), *aff'd*, 418 So.2d 553 (La.1982)]. If a party has a "legitimate and serious interest" in the exercise of the right, then the injured person cannot recover under a theory of abuse of rights.

*Id.* at 519.

The only time the abuse of rights doctrine has been utilized in an employment at will case was an anomaly, as the supreme court itself has noted:

> The Abuse of Rights doctrine is a civilian concept which is applied only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights. In *Morse v. J. Ray McDermott & Co.*, 344 So.2d 1353 (La.1977), this court recognized the Abuse of Rights doctrine. There, we held that an employer could not defeat his obligation to pay an employee the remaining portions of the

---

[9] Age discrimination, discrimination based on disability; La.R.S. 23:331 discriminating against a veteran for taking time away from work to attend medically necessary appointments, 23:332 discriminating against an individual because of race, color, religion, sex, national origin, or natural, protective, or cultural hairstyle (Definition of natural, protective, or cultural hairstyle-shall include but is not limited to afros, dreadlocks, twists, locs, braids, cornrow braids, Bantu knots, curls, and hair styled to protect hair texture or for cultural significance.); 22:352: discriminating against those with sickle cell trait; 23:368 discrimination based on genetic traits.

employee's compensation by terminating his employment without cause. Since that case, *neither this court nor the courts of appeal have applied the doctrine.*

The Abuse of Rights doctrine has been applied only when one of the following conditions is met:

(1) if the predominant motive for it was to cause harm;

(2) if there was no serious or legitimate motive for refusing;

(3) if the exercise of the right to refuse is against moral rules, good faith, or elementary fairness;

(4) if the right to refuse is exercised for a purpose other than that for which it is granted.

*Illinois Central Gulf Railroad Co. v. International Harvester Co.*, supra; Cueto-Rua, Abuse of Rights, 35 La.L.Rev. 965 (1975).

*Truschinger v. Pak*, 513 So.2d 1151, 1154 (La.1987) (emphasis added).

In *Massachusetts Mut. Life Ins. Co. v. Nails*, 549 So.2d 826 (La.1989), the supreme court found that the abuse of rights doctrine did not apply when an insurance company dropped coverage of Nails, who was terminated from his position at Exxon after being rendered a quadriplegic in a non-work-related accident. The supreme court declined to apply the abuse of rights doctrine, noting that it would take "legislative reform" rather than the "judicial restructuring of insurance policies" to use the abuse of rights doctrine to abrogate the legitimate terms of an insurance contract. *Id.* at 832. Similarly, the legislature will have to act before the employment-at-will doctrine can be overcome by an abuse of rights claim anytime an employee asserts a wrongful termination claim.

LCCC argues in brief:

Like the defendant in *Walther* [848 F.2d 518], Lake Charles Care Center derived a benefit by exercising its legal right to discharge Sonnier, an at-will employee. Namely, by discharging Sonnier, Lake Charles Care Center avoided the liability inherent in employing workers, such as the payment of wages and benefits. Because Lake Charles Care Center derived a benefit from exercising its right, it is not liable under the abuse-of-rights doctrine. In any event, Lake Chares

30

Care Center has a "legitimate and serious interest" in the ability to discharge at-will employees at anytime for any reason, as enshrined in La.Civ.Code art. 2724.

Finally, there are broad public policy concerns should this Court sanction the trial court's unprecedented judgment. A ruling that an employer can be liable for terminating an at-will employee cuts both ways. Any time an employee chooses to end their employment, they could potentially be subject to a lawsuit by the employer for abuse of their right to depart. Such a result is untenable, unduly restricts employee's freedom to choose their employment, and conflicts with the clear language of La.Civ.Code art. 2747.

The abuse of rights doctrine cannot vitiate the employer's right to terminate an at-will employee. While we find that Sonnier was protected under the Whistleblower Statute, the trial court legally erred in finding that she had a valid abuse of rights claim. Accordingly, we reverse the trial court's finding that Sonnier's termination was an abuse of rights.

## *LUTPA*

For the same reasons noted above, we address this argument because of its relationship to the damages awarded Sonnier. Louisiana's Unfair Trade Practices and Consumer Protection Law declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La.R.S. 51:1405(A). In brief, Sonnier cites *Cheramie Servs., Inc. v. Shell Deepwater Prod. Inc.,* 09-1633 (La. 4/23/10), 35 So.3d 1053, for the proposition that "any person, natural or juridical, who suffered an ascertainable loss resulting from another's use of an unfair method of competition and unfair or deceptive acts or practices in the conduct of any trade or business." However, Sonnier does not elaborate further. It is true that *Cheramie* held that "persons who are neither business competitors nor consumers can bring an action for damages pursuant to the Unfair Trade Practices and Consumer Protection Law." *Id.* at 1054. *Cheramie* went on to state:

31

The definition portion of LUTPA is found in LSA-R.S. 51:1402 which provides, in pertinent part:

> (1) "Consumer" means any person who uses, purchases, or leases goods or services.
>
> . . . .
>
> (3) "Consumer transaction" means any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use.
>
> . . . .
>
> (8) "Person" means a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity.
>
> (9) "Trade" or "commerce" means the advertising, offering for sale, *sale,* or distribution of *any services* and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes *any trade or commerce directly or indirectly affecting the people of the state*.

An examination of these sections of LUTPA reveals that the legislation contains no language that would clearly and expressly bar a "person" (such as the individual and the corporation that are the plaintiffs herein) from bringing an action for unfair trade practices. To the contrary, *LUTPA grants a right of action to any person, natural or juridical, who suffers an ascertainable loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce*. Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members. As noted in *Capitol House Preservation Company, L.L.C. v. Perryman Consultants, Inc.*, 98-1514, pp. 12-13 (La.App. 1 Cir. 12/10/98), 725 So.2d 523, 530, Louisiana courts have repeatedly held that there is no such limitation in LUTPA.

An evaluation of the words of this statute leads to the conclusion that, consistent with the definition and usage of the word "person," there is no such limitation on those who may assert a LUTPA cause of action. Any such limitation that has found its way into the jurisprudence resulted without proper analysis of the statute.

*Id.* at 1056-57 (emphasis added) (footnote omitted).

32

Nursing home care is the sale of a service, specifically, to provide care to infirm persons. Sonnier's petition states the firing itself was a violation of LUTPA. While White's behavior was egregious and fraudulent, it does not obviate the general rule that an at-will employee cannot have a LUTPA claim. The Whistleblower Statute was the proper mechanism for asserting a wrongful termination; LUTPA is not. If every at-will employee could pursue claims under LUTPA, the employment-at-will doctrine would be significantly undermined.

In *In re Anderson*, 539 B.R. 277 (Bankr. W.D.La. 2015), Anderson claimed she was wrongfully terminated in violation of LUTPA. The court held:

> With respect to Anderson's termination, the summary record reflects that Anderson was a W-2 employee of the company. Plaintiffs have not come forward with any evidence of an employment contract, a company handbook, or any other document or policy that restricted the company's ability to terminate Anderson. As a result, Anderson was an "at will" employee of AB Family, Inc. and *her termination cannot give rise to a claim under the Louisiana Unfair Trade Practice Act. See La. Civil Code Art. 2747* ("A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for so doing. The servant is also free to depart without assigning any cause."); see also *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So.3d 1053, 1061 (La.2010) (*exercising rights* under the "at will" employment doctrine does not give rise an unfair trade practice claim). Accordingly, the court grants defendants' motion for summary judgment with respect to plaintiffs' unfair trade practice claims.

*Id.* at 289 (emphasis added).

The trial court legally erred in finding that Sonnier, an at-will employee, had a LUTPA claim because terminating an at-will employee is not an unfair trade practice. This legal error is reversed.

### DAMAGES

#### *Attorney Fees*

The trial court awarded Sonnier $104,177.50 in attorney fees based on a post-trial affidavit of her attorney setting forth the billable hours and expenses for

Sonnier's case. LCCC argues that Sonnier provided no evidence at trial or in a post-judgment rule regarding attorney fees. We disagree. The trial court was authorized to award reasonable attorney fees under La.R.S. 23:967(B). As to attorney fees, the trial court noted in its oral reasons:

> Lastly, counsel for the Plaintiff attested by affidavit that Plaintiff's attorney's fees and expenses total over a $100,000, 108,000 to be exact. Plaintiff also attached a complete description and itemization of the tasks and the bills that he incurred over the course of his representation. And accordingly, the Court awards attorney's fees in the amount of $108,000 – I'm sorry, $104,177.50[.]

We recently noted in *Hooper v. La. Pigment Co.*, 19-816, pp. 46-47 (La.App. 3 Cir. 5/13/20), 298 So.3d 810, 835-36:

> In *Stanley v. Crowell & Owens, LLC*, 15-395, pp. 3-4 (La.App. 3 Cir. 10/7/15), 175 So.3d 1204, 1207-08, *writ denied*, 15-2035 (La. 1/8/16), 184 So.3d 694, this court reviewed the law regarding appellate review of an attorney fee award:
>
>> This court reviews the trial court's award of attorney fees under the abuse of discretion standard. *Covington v. McNeese State Univ.*, 12-2182 (La. 5/7/13), 118 So.3d 343. In *Covington*, the supreme court stated that in applying that standard, "the role of the reviewing court is not to determine what it considers to be an appropriate award, but rather it is to review the exercise of discretion by the trier of fact." *Id.* at 351. Still, we review the trial court's factual findings in reaching the award at issue pursuant to the manifest error/clearly wrong standard. *Stobart v. State, Dep't of Trans. & Dev.*, 617 So.2d 880 (La.1993); *Cottonport Bank v. Keller Prop. Mgmt., LLC*, 13-649 (La.App. 3 Cir. 12/11/13), 128 So.3d 668.
>
> Additionally, the trial court has discretion in determining the amount of an attorney fee based upon its own knowledge, the evidence, and its observation of the case and the record. *Custom-Bilt Cabinet & Supply, Inc. v. Quality Built Cabinets, Inc.*, 32,441 (La.App. 2 Cir. 12/8/99), 748 So.2d 594. In fact, a court does not have to hear evidence concerning the time spent or hourly rates charged in order to make an award since the record will reflect much of the services rendered. *Burford v. Burford*, 95-2318 (La.App. 1 Cir. 6/28/96), 677 So.2d 722.

When the nature and extent of the services of an attorney are shown by the record, it is the duty of the court to bring to bear its knowledge of the value of the services of counsel and to fix the value even in the absence of expert testimony. *Mitchell v. Turner*, 588 So.2d 1305 (La.App. 2 Cir.1991).

The factors to be considered in determining the reasonableness of an attorney fee award on appeal include:

(1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.

*State, Dep't of Transp. & Dev. v. Williamson*, 597 So.2d 439, 442 (La.1992).

Based on our review of the record and the affidavit of Sonnier's attorney setting forth his billable hours, we find no error in the trial court's award of attorney fees. Counsel obtained a favorable result in whistleblower litigation that rarely succeeds. This assignment of error is without merit.

*Legal Interest*

"The court shall award legal interest in the judgment as prayed for or as provided by law." La.Code Civ.P. art. 1921. "Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, 'ex-delicto', which may be rendered by any of the courts." La.R.S. 13:4203. Legal interest must be prayed for unless the claim sounds in tort. *Scruggs v. Minton Equip. Co., Inc.,* 98-987 (La.App. 3 Cir. 12/9/98), 722 So.2d 130. Sonnier prayed for legal interest in her petition. However, contrary to LCCC's claims, retaliatory firing for whistleblowing is a tort; thus a prayer for relief was not necessary. *See Overton v. Shell Oil Co.*, 05-1001 (La.App. 4 Cir. 7/19/06), 937 So.2d 404, *writ denied*, 06-2093 (La. 11/3/06), 940 So.2d 674; *Nolan v. Jefferson Parish Hosp. Serv. Dist. No. 2*, 01-175, p.12

(La.App. 5 Cir. 6/27/01),790 So.2d 725, 733 ("[W]histle-blower" claims . . . are delictual in nature."); *Sampson v. Wendy's Mgmt., Inc.*, 593 So.2d 336 (La. 1992) (retaliatory discharge for filing workers compensation claims is a tort). We note that the LUTPA and abuse of rights claims cannot be the basis for any damages, as we have found the trial court legally erred in its findings relating to those claims. Accordingly, we affirm the trial court's award of legal interest from the date of judicial demand for Plainitff's general and special damages, and legal interest from the date of judgment on attorney fees and court costs is also affirmed.

### *General Damages*

In *Wainwright v. Fontenot*, 00-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74 (alteration in original), the standard to be used by an appellate court when reviewing a quantum award was set forth by our supreme court:

> The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993). Moreover,
>
> > before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.
>
> *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted).

It is not our role to determine what we feel is an appropriate award. We can only disturb the trier of fact's determination if it abused its discretion. *Youn*, 623

So.2d 1257 (La. 1993). The trial court awarded Sonnier $214,000 in mental anguish damages noting in its oral reasons for ruling:

> The evidence shows that Ms. Sonnier suffered mental anguish, extreme mental anguish, and lost wages because of her wrongful termination and because of the Defendant's violation under the statutes as previously discussed.

> Ms. Sonnier testified that she suffered mentally to the point that she was prescribed antidepressants. Ms. Sonnier's car was repossessed. The state mistakenly denied her eligibility to government assistance and she missed mortgage payments on her home. Despite her termination from Lake Charles Care Center, her role as a mother could not terminate. Ms. Sonnier was a single mother who had to provide for the three children living in her household during such a tumultuous time in her life. The mental anguish Ms. Sonnier suffered was evident in her testimony, such as her peers having to provide meals for her and her family and said mental anguish was still evident even up until the date of trial and could be ongoing.

> Although she regained financial stability some years later, nothing can repair the anguish she still experiences and has experienced in the past at the hands of the illegal scheme of Lake Charles Care Center. Ms. Sonnier's mental distress was evidenced by her grief, pain, and tears expressed while testifying at trial over five years after the event.

> Therefore, the Court awards damages for mental anguish in the amount of $214,000, which is $5,000 per month from the time she was terminated until she found some employment; $3,500 per month from the time she was underemployed until she became the Director of Nursing at Rosewood; and $2,500 per month from the time she was at Rosewood up until the date of trial. Total amount, $214,000.

Having reviewed all of the testimony and evidence, we cannot say that the trial court manifestly erred in its award of $214,000 in general damages. It was in a superior position to assess the mental anguish suffered by Sonnier, and we find the award reasonable in light of the circumstances. Accordingly, this assignment of error is without merit.

*Special Damages*

Special damages are those that may be calculated with some degree of mathematical certainty and include claims for lost wages. *Thibeaux v. Trotter*, 04-

37

482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128. We review a trial court's award of lost wages using a manifest error standard of review. *Id.* The trial court, in its oral reasons, stated:

> As to lost wages, Ms. Sonnier struggled to find employment after Defendant terminated her. Even when she found employment, they offered only part-time positions that paid far less that what she made at Lake Charles Care Center. Ms. Sonnier did not find employment that was financially comparable to what she earned at Lake Charles Care Center until November 2019, over three years later. Ms. Sonnier testified that she calculated the amount of her lost wages by reviewing her tax returns from 2016 to 2018. Therefore, the Court awards damages for lost wages in the amount of $62,000.

LCCC argues Sonnier was only employed part-time following her discharge. Sonnier testified that was the only work she could find. The trial court clearly found Sonnier's testimony credible regarding her attempts to find work and what type of work was available to her following her wrongful termination. It deemed her method of calculating her lost wages reasonable, and we find no error in its conclusions.

Finally, we note that the awards are supported even in the absence of the LUTPA and abuse of rights claims. Accordingly, this assignment of error is without merit.

## CONCLUSION

The judgment of the trial court finding that the Plaintiff/Appellee, Danella Taylor Sonnier, was entitled to whistleblower protection under La.R.S. 23:967, is affirmed. The judgment of the trial court awarding her $458,727.01 is affirmed. That portion of the judgment finding violations of LUTPA and an abuse of rights is reversed. All costs of this appeal are assessed against the Defendant/Appellant, Diversified Healthcare-Lake Charles, LLC, d/b/a Lake Charles Care Center.

**AFFIRMED AS AMENDED.**